*Howard Nathanson, et al. v. Tortoise Capital Advisors, L.L.C., et al.*, No. 51, September Term, 2025. Opinion by Gould, J.

**CORPORATIONS AND ASSOCIATIONS – SHAREHOLDER DERIVATIVE ACTIONS – PRE-SUIT DEMAND – FUTILITY EXCEPTION**

The Supreme Court of Maryland held that, under *Werbowsky v. Collomb*, 362 Md. 581 (2001), whether the futility exception excuses the failure to make a pre-suit demand on the board of directors to commence litigation depends on whether the shareholders clearly and particularly allege that a majority of the board of directors could not consider a litigation demand in accordance with the standard of conduct imposed on directors under subsection 2-405.1(c) of the Corporations & Associations Article. Futility hinges on the board's capacity to consider a demand, not on the likelihood that the board would refuse it. The Supreme Court further determined that the phrase in *Werbowsky*—"conflicted or committed to the decision in dispute"—describes a single inquiry, not two distinct routes to establish futility. 362 Md. at 620.

In addition, the Supreme Court determined that allegations that directors, who were disinterested when the challenged business decisions were made, face substantial or unexculpated personal liability from derivative claims, do not establish futility because that analysis would require courts to assess the merits of the derivative claims, which *Werbowsky* forbids. 362 Md. at 621-22. Here, the board's conduct did not clearly and particularly show that a majority of directors could not reasonably be expected to consider the demand within § 2-405.1(c)'s standards of conduct.

**CORPORATIONS AND ASSOCIATIONS – SHAREHOLDER DERIVATIVE ACTIONS – PRE-SUIT DEMAND – FUTILITY EXCEPTION**

The Supreme Court of Maryland held that a pre-suit demand is excused as futile only where the allegations or evidence clearly demonstrate, in a very particular manner, either that a demand or a delay in awaiting a response would cause irreparable harm, or that a majority of the directors are so *personally and directly conflicted or committed to the decision in dispute* that they cannot reasonably be expected to respond to a demand in good faith, in a manner the director reasonably believes to be in the best interests of the corporation, and with ordinary prudence.

Circuit Court for Baltimore City
Case No.: 24-C-23-002372
Argued: April 9, 2026

IN THE SUPREME COURT

OF MARYLAND

No. 51

September Term, 2025

_____

HOWARD NATHANSON, et al.

v.

TORTOISE CAPITAL
ADVISORS, L.L.C., et al.

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

_____

Opinion by Gould, J.

_____

Filed: July 14, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This is a derivative action brought by two shareholders on behalf of two Maryland corporations operating as closed-end funds, against the funds' investment adviser and members of the funds' board of directors. Maryland law requires shareholders to make a pre-suit demand on the board of directors to initiate litigation on the corporation's behalf before filing a derivative action. The shareholders did not do so here, but instead invoked what is called the futility exception to the demand requirement.

The futility exception is governed by *Werbowsky v. Collomb*, 362 Md. 581 (2001), where we held that a pre-suit demand is excused only in the limited circumstances explored below. Here, the Circuit Court for Baltimore City concluded that the shareholders did not plead sufficient facts to bring this case within that limited exception and dismissed the action with prejudice. The Appellate Court of Maryland affirmed.

So shall we.

In doing so, we aim to clarify two aspects of the futility exception. *First*, *Werbowsky* asks whether a majority of the board could respond to a demand "in good faith and within the ambit of the business judgment rule." *Id.* at 620. In Maryland, that rule finds expression in the standard of conduct imposed on directors under subsection 2-405.1(c) of the Corporations and Associations Article. MD. CODE ANN., CORPS. & ASS'NS ("CA") § 2-405.1(c) (2025). Expressed in those statutory terms, *Werbowsky* asks whether a majority of the directors are "so personally and directly conflicted or committed to the decision in dispute[,]" 362 Md. at 620, that they could not consider a litigation demand "in good faith[,]" "[i]n a manner [they] reasonably believe to be in the best interests of the corporation[]" and "[w]ith the care that an ordinarily prudent person in a like position

would use under similar circumstances[,]" CA § 2-405.1(c). "Conflicted or committed" describes a single inquiry—whether the directors could consider the demand under the governing standard of care. CA § 2-405.1(c). If the answer to that inquiry is "yes," then the futility exception does not apply.

*Second*, futility turns on the board's capacity to consider a demand, not on the shareholders' prediction—however reasonable—of the board's probable answer. A board that would likely say no to a demand is not necessarily incapable of considering it in conformity with subsection 2-405.1(c). As the Seventh Circuit explained in an opinion from which we drew in *Werbowsky*, a shareholder who invokes the futility exception based on a likely refusal "confuses futility with failure." *Kamen v. Kemper Fin. Servs., Inc.*, 939 F.2d 458, 462 (7th Cir. 1991), *aff'd*, 500 U.S. 90 (1991); *see Werbowsky*, 362 Md. at 616-17.

I

Because this case comes to us on the grant of a motion to dismiss, we take the facts from the operative complaint, assuming the truth of its well-pleaded allegations and the reasonable inferences that may be drawn from them. *Oliveira v. Sugarman*, 451 Md. 208, 219-20 (2017).

A

Tortoise Pipeline & Energy Fund, Inc. ("TYG") and Tortoise Energy Independence Fund, Inc. ("NTG") (collectively, the "Funds") are closed-end investment funds organized as Maryland corporations. Respondent Tortoise Capital Advisors, L.L.C. ("Tortoise") served as the Funds' investment adviser, responsible for day-to-day operations and

management of the Funds' portfolios under advisory contracts that paid Tortoise a fee calculated as a percentage of the total assets under its management.

At all relevant times, each fund was governed by a board of directors comprised of the same five individuals. Four of the directors—Conrad S. Ciccotello, Rand C. Berney, Jennifer Paquette, and Alexandra Herger—are alleged to have been independent from Tortoise. The fifth, H. Kevin Birzer, was not independent from Tortoise—he was its chief executive officer. The board was responsible for overseeing Tortoise and for setting controls over the Funds' investment risks and the conflict of interest created by Tortoise's fee structure (discussed below).

## B

A closed-end fund issues a fixed number of shares that then trade on an exchange; unlike an open-end mutual fund, it does not continuously issue new shares or stand ready to redeem outstanding ones on demand. Thus, an open-end fund must keep cash reserves on hand to meet redemptions, while a closed-end fund need not—and so, a closed-end fund ordinarily carries little inherent liquidity risk. The Funds used that structure to hold, for the long-term, interests in master limited partnerships in the energy sector—partnerships that own and operate pipelines and related infrastructure for transporting, gathering, processing, and storing natural gas, natural gas liquids, crude oil, and refined products. The energy sector is volatile, and the closed-end structure was meant to let the Funds weather the volatility without being forced to sell holdings in a falling market.

The Funds used leverage to increase their returns. Leverage in this context means that a fund borrows money and invests the proceeds alongside its own capital, which

3

magnifies its returns when the market goes up and its losses when the market falls. A simple example demonstrates how that works. Assume you buy a share of the fictitious ABC corporation for $10. The next day, you sell the stock for $11, locking in a $1 profit. Basic math shows you made a 10% return on your money. And if you sold the stock for $9, you lost 10% of your money.

But suppose that, in addition to your $10, you used $90 of borrowed funds so that you could invest $100 instead of just $10. So, now you buy 10 shares of ABC Corporation instead of just one share. The next day, when you sell those 10 shares for $11 each, you lock in a $10 profit—a 100% return on *your* money. However, if you sold the stock the next day for $9, you would have to use the entire sales proceeds of $90 to repay the loan, leaving you with nothing—a 100% loss to you.

That is why borrowing is called leverage: just as a lever permits a smaller amount of force to move a larger load, financial leverage permits a smaller amount of a fund's capital to acquire a larger base of assets, magnifying the gains when those assets increase in value and the losses when their value falls.

The Funds' borrowing agreements required them to maintain set ratios of assets to debt, and to pay down debt if the value of their assets fell below the agreed thresholds. If the Funds lacked sufficient cash, they would have to raise cash by selling their holdings. Thus, the Funds' use of leverage reintroduced a liquidity risk that the closed-end structure is designed to avoid. In public filings, the Funds stated their policy of using leverage in the range of 20 to 30% of assets, averaging about 25%. But the Funds exceeded that range for years, reaching roughly 37% at TYG and nearly 40% at NTG by the end of 2019, with no

4

policies or controls to enforce the target range or measure liquidity risk along the way. This served Tortoise's interest, because Tortoise's fee rose with the Funds' total assets, including those purchased with borrowed money—so more leverage meant more fees.

In early 2020, when energy prices fell sharply, so too did the value of the Funds' holdings, thus putting the Funds in violation of their assets-debt ratio requirements. This forced Tortoise to sell hundreds of millions of dollars of the Funds' holdings into a declining market to raise cash and reduce debt, locking in losses. By the end of the first quarter of 2020, the Funds reported combined losses exceeding $1 billion.

After the Funds' collapse in value, the board renewed Tortoise's advisory contracts and publicly described Tortoise's management as "responsible" and the Funds' performance as "reasonable[.]" In October 2020, it adopted by-laws restricting shareholder voting and nomination rights; supported, through the Funds, the dismissal of an earlier action filed in Kansas (discussed below), calling the claims "meritless"; rejected a books-and-records inspection request by the two shareholders who brought this action; and rejected a proposal from a third party to discuss acquiring the Funds' claims against Tortoise.

C

The two shareholders who brought this action are Petitioners Howard Nathanson and Gus Gordon (the "Shareholders"). They first sued the board and Tortoise in the United States District Court for the District of Kansas in August 2022. In February 2023, that court dismissed the case based on a forum selection clause in the Funds' by-laws. The Shareholders refiled in the Circuit Court for Baltimore City in May 2023 and amended

their complaint in November 2023. The amended complaint included multiple claims brought individually and derivatively on behalf of the Funds against the directors and Tortoise. Only Count II, a derivative claim against the directors and Tortoise for breach of their duties, is before us.[1] The Shareholders did not make a demand on the board to bring suit before filing the action.

D

The circuit court dismissed Count II on two independent grounds, one of which was the Shareholders' failure to make a pre-suit demand. On that issue, the court pointed out that under *Werbowsky*, demand is the default rule and futility is the exception. The court then turned to each allegation in the amended complaint, considered whether the allegations, if true, established that a demand would be futile, and determined that none of the allegations satisfied the futility exception. The court concluded that the allegations were conclusory, pleaded without specificity, impermissibly required an analysis of the underlying merits of the suit, and otherwise failed to establish that the directors could not consider a demand under the governing standard of conduct.

E

On appeal, the Appellate Court affirmed. *Nathanson v. Tortoise Cap. Advisors, LLC*, 267 Md. App. 1, 61 (2025). The court held that the Shareholders' allegations showed, at most, that a demand was unlikely to succeed—not that it was futile. *Id.* at 60-61. The

---

[1] The amended complaint pleaded several counts, and the circuit court dismissed all counts with prejudice. The Shareholders appealed only the dismissal of Count II. We express no view on the other counts, or on the alternative grounds on which the circuit court dismissed the amended complaint with prejudice.

6

court rejected the Shareholders' principal futility theory—that the directors' mismanagement exposed them to over $1 billion in personal liability—because liability exposure, even when substantial, does not excuse demand under *Werbowsky*. *Nathanson*, 267 Md. App. at 52-54.

The court likewise rejected the Shareholders' theory that the Board's post-collapse conduct—renewing Tortoise's contracts, praising Tortoise's performance, adopting defensive by-laws, declining to pursue claims on its own, rejecting a third-party proposal to discuss buying the claims, and opposing the earlier federal action—showed that a majority of directors could not reasonably consider a demand. *Id.* at 55-60. Those allegations were speculative, insufficiently tied to the challenged decision, or showed only hostility to litigation. *Id.* Because the amended complaint did not particularly plead a disabling conflict or commitment, the court held that the Shareholders' failure to make a pre-suit demand was not excused. *Id.* at 60-61.

We granted certiorari to determine whether the Appellate Court erred in its application of the demand futility rule established in *Werbowsky*. *Nathanson v. Tortoise Cap. Advisors, L.L.C.*, 492 Md. 698 (2025).

II

Because a derivative action takes a corporate decision out of the board's hands, the law requires the shareholder, in all but the rarest cases, to ask the board to act before the shareholder acts on its behalf. *Oliveira*, 451 Md. at 222-23. That request is the pre-suit demand. We begin by explaining the rationale behind the demand requirement and why the futility exception is narrowly drawn.

7

A

A corporation is owned by its stockholders but managed by its directors. *Werbowsky*, 362 Md. at 599. By statute, "[a]ll business and affairs of a corporation, whether or not in the ordinary course, shall be managed by or under the direction of a board of directors," and "[a]ll powers of the corporation may be exercised by or under authority of the board of directors[,]" except as reserved to the stockholders by law or by the corporation's charter or by-laws. CA § 2-401(a), (b). In addition, the board acts as a single body; individual directors do not act on their own. *See* CA § 2-408(a) (providing that an "action of the board of directors" ordinarily requires the affirmative vote of "a majority of the directors present at a meeting").

The standards that govern a director's conduct, once grounded in common law, have been codified in section 2-405.1 of the Corporations and Associations Article. Subsection (c) provides that a director shall act:

(1) In good faith;
(2) In a manner the director reasonably believes to be in the best interests of the corporation; and
(3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

A director "who acts in accordance with [that] standard of conduct" enjoys statutory immunity from liability. CA § 2-405.1(e). "An act of a director of a corporation is presumed to be in accordance with subsection (c)[.]" *Id.* § 2-405.1(g). And the statute "[i]s the sole source of duties of a director to the corporation or the stockholders of the corporation[.]" *Id.* § 2-405.1(i)(1); *see also Eastland Food Corp. v. Mekhaya*, 486 Md. 1, 24-25 (2023) (explaining that section 2-405.1 is the exclusive source of a director's duties, displacing

8

any common-law duties that had previously governed.) Thus, what practitioners and courts have long called the "business judgment rule" now finds expression in section 2-405.1.

The board has broad authority "except as conferred on or reserved to the stockholders by law or by the charter or bylaws of the corporation." CA § 2-401(b). Thus, shareholders maintain some, albeit limited, supervisory authority under Maryland corporate law. Shareholders hold the statutory power to elect directors and remove them "with or without cause," *id.* §§ 2-404(b)(1), 2-406(a); vote their shares on matters placed before them, *id.* § 2-507(a); move for special meetings, *id.* § 2-502(b)(1); inspect the corporate books, *id.* §§ 2-512, 2-513; and adopt, alter, or repeal by-laws unless that power has been vested elsewhere, *id.* § 2-109(b). Shareholders also retain approval rights over certain fundamental corporate changes. *See, e.g.*, *id.* §§ 2-604(d)-(f) (charter amendments), 3-105(d), (e) (mergers), & 3-403(c)-(e) (dissolution). Thus, shareholders are not strangers in the corporate structure; they maintain some tools to hold the board accountable for its stewardship of the corporation.

B

The allocation of authority between the shareholders and the board provides the backdrop against which a derivative action must be understood, and it explains why we have called a derivative action an "extraordinary equitable device[.]" *See Werbowsky*, 362 Md. at 599.

Investors who buy stock accept certain risks. They accept the risk that the business idea was a poor one from the start. They accept the risk that the people running the company will prove unable to execute even a good idea. And they accept the risk that the directors,

9

and the officers they appoint, are incompetent, or, even if competent, will make decisions that turn out badly.

Courts do not insure against those risks. Courts do not sit to manage the internal affairs of corporations, *see NAACP v. Golding*, 342 Md. 663, 673 (1996), and they do not second-guess, with the benefit of hindsight, business decisions that disappointed the investors. Shareholders know this when they buy their stock. They likewise know that their role in the company is limited—that the responsibility for managing the corporation's business and affairs lies with the board, not with them.

One of the business decisions entrusted to the board is whether the corporation should sue. *Werbowsky*, 362 Md. at 598-99. A corporation may hold a claim that is both meritorious and valuable and yet decide, in the sound exercise of its business judgment, not to pursue it—perhaps because the litigation would cost more than it is worth, distract management from more profitable endeavors, damage a relationship the corporation wishes to preserve, or for any number of other reasons that have nothing to do with the strength of the claim. *See id.* at 601 (directors may "waive a legal right vested in the corporation" if they believe the corporation's "best interests will be promoted by not insisting on such right" (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991))).

Thus, it is no small thing to let a shareholder take that decision out of the board's hands. Yet, a derivative action does just that: it allows a single shareholder—who is not bound by the standard of conduct that constrains directors—to seize control of a claim that belongs to the corporation and litigate it in the corporation's name, over the board's

10

objection. The pre-suit demand requirement exists so that this does not happen before the board, the corporation's ordinary and default decision-maker, has had the chance to consider the question for itself. The pre-suit demand requirement is designed to keep this one business decision—to sue or not to sue—on the same footing as all other business decisions entrusted to the board.

C

So the futility exception is a narrow one. Aggrieved shareholders may prefer not to make a demand out of concern that the board would refuse it and decline to pursue the litigation. But a demand, once made and refused, does not necessarily end the matter. A demand refused is subject to judicial review—under the same statutory standard of conduct applicable to all board decisions. Thus, to understand why the futility exception is narrow, it helps to understand what happens when a demand is refused.

1

We look first at *Boland v. Boland*, which involved two corporations with four-person boards owned primarily by eight siblings. 423 Md. 296, 308, 312 (2011). Three of the siblings were directors, and five were not. *Id.* at 308. The non-director siblings learned of a stock transaction in which the director siblings had acquired additional corporate stock for themselves. *Id.* Alleging self-dealing and breach of fiduciary duty, the non-director siblings sent a litigation demand to the board but, without waiting for a response, filed suit.

11

*Id.* at 308-09. Recognizing that a majority of the directors were interested[2] in the transaction at issue, the board appointed a "special litigation committee" ("SLC"), consisting of two newly hired independent directors to investigate the demand. *See id.* at 319. After a five-month investigation, the SLC concluded that "none of the derivative claims have merit and the actions on behalf of the corporations should be terminated." *Id.* at 320. Relying on the committee's report and applying deferential business-judgment review, the court granted summary judgment against the shareholder plaintiffs on the derivative counts. *Id.* at 324.

The principal question before this Court was which standard of review should apply to the SLC's demand refusal. We noted the general rule that disinterested boards receive the protection of the business judgment rule, which means that "the court considering a demand refused action limits its review to whether the board acted independently, in good faith, and within 'the realm of sound business judgment.'" *Id.* at 329-30 (quoting *George Wasserman & Janice Wasserman Goldsten Fam. LLC v. Kay*, 197 Md. App. 586, 611 (2011)). The premise behind that rule is that ordinary business-judgment deference belongs to decision-makers who can act for the corporation without a self-dealing interest in the outcome.

The reality is, however, that "many business dealings[,]" like the one at issue in *Boland*, "are approved by directors who are not entirely disinterested[,]" and thus the board's refusal may not be entitled to deference. *Id.* at 332. In such a scenario, the board

---

[2] A director is "interested" when the director appears on both sides of a transaction or expects to derive a personal financial benefit from it, rather than a benefit shared by the corporation or shareholders generally. *Oliveira*, 451 Md. at 224; *Boland*, 423 Md. at 329; *Werbowsky*, 362 Md. at 609.

would lose the protection of the business judgment rule, and shareholders would find it quite easy to wrest control of corporate litigation from the board. To avoid that scenario, we recognized "a vehicle, usually known as a special litigation committee . . . , through which corporations can retain a voice in the derivative lawsuit despite the adverse interests of board members." *See id.* (citing *Gall v. Exxon Corp.*, 418 F. Supp. 508 (S.D.N.Y. 1976)). We noted that "[b]y isolating the tainted directors and delegating the corporation's decision-making ability to an independent committee, the directors may be able to insulate themselves from a derivative lawsuit." *Id.* The remaining question was the level of scrutiny to be applied to the SLC's recommended refusal: the standard business judgment rule or something more rigorous.

After surveying out-of-state case law, we settled on a "modified" business judgment rule. *Id.* at 340-41. We held that, although the SLC's substantive decision whether to accept the demand would be entitled to deference, when the SLC is appointed by an interested board, there is no presumption that "the SLC was independent, acted in good faith, or followed reasonable procedures." *Id.* at 340. Thus, courts should not automatically credit an SLC's refusal of a litigation demand "unless the directors have stated how they chose the SLC members and come forward with some evidence that the SLC followed reasonable procedures and that no substantial business or personal relationships impugned the SLC's independence and good faith." *Id.* at 340-41. The shareholder plaintiff, for its part, can challenge the board's evidence that the SLC's members were disinterested. *Id.* at 350. This procedure, we held, was consistent with "Maryland's business judgment rule, which 'can

13

be claimed only by *disinterested* directors whose conduct otherwise meets the tests of business judgment.'" *Id.* (quoting *Werbowsky*, 362 Md. at 609).

We were careful to say that this review, "though not on the merits, can be rigorous on the questions of good faith, independence, and procedure." *Id.* at 342. And, in fact, we vacated the summary judgment entered against the plaintiffs because the directors had never stated how the committee was chosen. *Id.* at 352-53.

We explained

that a procedural review under the business judgment rule, although clearly the more deferential standard, nonetheless provides for a thorough review of an SLC's independence, good faith, and methodology, and such inquiry gives trial courts the ability to scrutinize SLC decisions and protect shareholders against collusive practices or inadequate investigations. Moreover, this approach protects against the danger of judicial overreach and "avoid[s] the problem in the second level of the *Zapata*[ *Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981)] test, which requires the judge to exercise his or her own business judgment."

*Id.* at 348 (quoting *Houle v. Low*, 556 N.E.2d 51, 59 (Mass. 1990)).

2

Then came *Oliveira v. Sugarman*. 451 Md. 208. The question there was whether *Boland*'s "modified" business judgment rule applies to "a disinterested and independent board of directors' decision to deny a shareholder litigation demand[.]" *Oliveira*, 451 Md. at 219. We held that this decision should be reviewed under the ordinary business judgment rule. We distinguished *Boland* on the ground that it "involved a board of directors who stood to benefit from the transaction being challenged[,]" while "in this case, Respondents' board of directors was both disinterested and independent." *Id.* at 226-27 (footnote omitted). The concerns animating *Boland*—the SLC's independence, good faith, and

14

procedure—were "simply not present[.]" *Id.* at 227. In so holding, we reaffirmed the primacy of the board in corporate decision-making and the deference owed to disinterested boards.

3

Together, *Boland* and *Oliveira* demonstrate why the futility exception is so narrow. If the board is interested and hides behind a committee, the corporation must prove the committee's independence before the refusal earns any deference, and that proof can be rigorously tested. Shareholders turned away by a board are not without recourse—if a demand is made, and the board refuses, that refusal is subject to judicial review under the standards codified in section 2-405.1. Rather than take that chance, shareholders often prefer to skip the demand and plead futility instead. So—to preserve the allocation of managerial responsibility that all shareholders accept when they make their investment— Maryland law does not permit a shareholder to bypass the demand requirement except in the narrow circumstances described in *Werbowsky*, to which we now turn.

III

A

In *Werbowsky*, minority shareholders of Lafarge Corporation brought a derivative action challenging Lafarge's purchase of assets from its "majority and controlling shareholder[,]" Lafarge S.A. ("LSA"). 362 Md. at 586. The shareholders sued Lafarge and its directors, alleging that Lafarge had overpaid LSA to the tune of $165 million to $210 million, and that the directors breached their fiduciary duties, committed gross negligence,

15

and wasted corporate assets. *Id.* at 591-92. The amended complaint alleged that no pre-suit demand was necessary because:

> (1) a majority of the allegedly independent directors actively participated in the wrongful conduct, which was the direct and proximate result of their grossly negligent failure to inform themselves adequately as to the company's affairs and harmful effects of the proposed purchase; (2) the directors of Lafarge received substantial compensation as board members and, in light of LSA's domination and control of Lafarge, had an incentive to appease LSA in order to maintain their position on the board; and (3) in light of the corporate insurance policies, neither the directors nor the company could be expected to pursue the claims made by the plaintiff.

*Id.* at 592.

Lafarge and the director defendants moved to dismiss because, among other reasons, the shareholder plaintiffs failed to make a demand on Lafarge's board. *Id.* Applying the reasoning that the Supreme Court of Delaware used in *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984),[3] the circuit court denied the motion because "there was a reasonable doubt as to whether at least 12 of Lafarge's 16 directors were independent, disinterested directors." *Werbowsky*, 362 Md. at 593.

After discovery, Lafarge moved for summary judgment, asking the court to revisit the demand issue. *Id.* at 594. Again, applying *Pogostin*, the court concluded that "the plaintiffs had failed to establish a reasonable doubt that a majority of the Lafarge board

---

[3] The circuit court understood the *Pogostin* test to require "a bifurcated analysis in which the facts alleged in the complaint are examined to determine whether they create a reasonable doubt that (1) the directors are disinterested and independent, and (2) the challenged transaction was the product of a valid exercise of business judgment." *Werbowsky*, 362 Md. at 593. Under that test, if the plaintiff alleges facts that support reasonable doubt as to either factor, the demand is excused. *Id.*

lacked independence" and therefore dismissed the action for failure to make a pre-suit demand on the Lafarge board. *Id.* at 597-98.

Before this Court, the question was whether the circuit court erred in concluding that pre-suit demand was not futile, either under this Court's holding in *Parish v. Maryland & Virginia Milk Producers Ass'n*, 250 Md. 24 (1968), or under the Delaware standard applied by the circuit court. *Werbowsky*, 362 Md. at 598. We explained that Maryland, like other states, recognizes the shareholder's derivative action as "a justifiable, but limited, intrusion upon the general authority of the directors to manage the business affairs of the corporation[.]" *Id.* at 602. The intrusion is permitted, however, only after a pre-suit demand is made, unless such a demand would be futile. *Id.* (citing *Parish*, 250 Md. at 81-82).

Because nearly 40 years had passed without a word on demand futility from this Court, we surveyed the case law on the futility exception in Maryland and cataloged developments elsewhere. *Id.* at 602-15. We recognized our prior formulation of the demand-futility rule in *Davis v. Gemmell*, 70 Md. 356 (1889), in which we stated that "it would be against the plainest principles of justice to permit the perpetrators of the wrong to conduct a litigation against themselves[,]" and demand would therefore be excused when "useless." *See Werbowsky*, 362 Md. at 604 (quoting *Gemmell*, 70 Md. at 376). We observed that nearly 80 years later, in *Parish*, we excused demand where the directors would be asked to sue themselves because "(1) it was not likely that the culpable directors would, in fact, agree to permit the company to sue them; and (2) even if they would so agree, because of their conflicted status, a court should not permit them to do so." *Werbowsky*, 362 Md. at 606.

17

We noticed, however, that since *Parish*, "the national trend had been to enforce more strictly the requirement of pre-suit demand and at least to circumscribe, if not effectively eliminate, the futility exception." *Id.* at 607 (citation modified). We observed that both the American Bar Association ("ABA") and the American Law Institute ("ALI") recommended scrapping the futility exception and requiring a demand in all cases. *Id.* at 611-14. Many states did so. *Id.* at 614-15.

We expressed general agreement with this trend, writing that "[t]here is much to be said for the ABA/ALI approach[.]" *Id.* at 617. But because such an approach would be a "radical departure from [Maryland's] current common law," we concluded that such a change should be made, if at all, by the General Assembly. *Id.* at 618. So, we preserved the futility exception to the demand requirement, but only as a "very limited exception[.]" *Id.* at 620.

In so doing, we emphasized that the "demand requirement *is* important." *Id.* at 618. We recognized that directors enjoy the "benefit and protection of the business judgment rule," and that their "control of corporate affairs should not be impinged based on non-specific or speculative allegations of wrongdoing." *Id.* at 619. We concluded that a demand is not futile "simply because a majority of the directors approved or participated in some way in the challenged transaction or decision," "on the basis of generalized or speculative allegations that they are conflicted or are controlled by other conflicted persons," or "because they are paid well for their services as directors, were chosen as directors at the behest of controlling stockholders, or would be hostile to the action." *Id.* at 618. We found that pre-suit demand was "not an onerous requirement[,]" and explained that a demand

18

may be the first time a director learns of a dispute and "gives the directors—even interested, non-independent directors—an opportunity to consider, or reconsider, the issue in dispute." *Id.* at 619.

Against that backdrop, we held that demand is excused only where the allegations or evidence "clearly demonstrate, in a very particular manner," either that a demand or a delay in awaiting a response would cause irreparable harm, or that:

> a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.

*Id.* at 620. We held that the directors were not conflicted or subject to the control by LSA such that a demand would have been futile, and thus affirmed the court's summary judgment in favor of the defendants. *Id.* at 620.

## B

As noted above, CA § 2-405.1 applies to all acts taken by directors and supplies the sole source of the duties that directors owe to a corporation and its shareholders. *See Eastland*, 486 Md. at 25. It is time, then, to restate *Werbowsky*'s futility test using the standard of care codified in CA § 2-405.1(c): A demand is excused as futile only where the allegations or evidence clearly demonstrate, in a very particular manner, either that a demand or a delay in awaiting a response would cause irreparable harm, or that a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith, in a

19

manner the director reasonably believes to be in the best interests of the corporation, and with ordinary prudence.

Two points about this reformulation require clarification before we apply it here: *first*, what counts as "the decision in dispute," and *second*, what it means for a director to be "conflicted or committed" to that decision.

1

Because the futility exception speaks to a director's personal conflict or commitment to "the decision in dispute," we must identify the "decision" to which this phrase refers. The "decision in dispute" is the transaction or conduct that the derivative claim challenges—here, the Funds' use of leverage and the board's oversight decisions that the Shareholders say cost the Funds $1 billion. A director's capacity to consider a demand hinges on his relationship with those underlying transactions or events. Even a director who "expects to derive a personal benefit" from a transaction "is not necessarily 'so personally and directly conflicted or committed to the decision in dispute that [he] cannot reasonably be expected to respond to a demand in good faith[.]'" *Oliveira*, 451 Md. at 229 (quoting *Werbowsky*, 362 Md. at 620). The question is whether his connection to the challenged conduct is such that he cannot weigh, in conformity with the statutory standard, whether the corporation should sue over it.

2

We now explain what it means for directors to be, in the words of *Werbowsky*, so "conflicted or committed" to the decision in dispute that they cannot be expected to consider a demand in conformity with section 2-405.1's standard of conduct.

20

The Shareholders read "committed to the decision in dispute" as a second and more forgiving route to futility than "conflicted"—and thus one that a shareholder may travel whenever the board has taken and defended a position consistent with the challenged decision. That is not what the phrase means.

"[S]o personally and directly conflicted or committed to the decision in dispute" describes a single condition: a connection to the underlying decision so personal and so direct that the director cannot consider the demand in accordance with subsection 2-405.1(c). *Werbowsky*, 362 Md. at 620. "Conflicted" and "committed" are two ways of describing one disabling condition, not two different tests. To read "committed" as the Shareholders do—to mean that a director is disabled whenever he has approved a decision, staunchly defended it, or said so in public—would resurrect the very considerations *Werbowsky* rejected when it announced the standard. Approval and participation do not excuse the lack of a demand, nor does hostility to the action. *Werbowsky*, 362 Md. at 618-19. "Committed to the decision in dispute" refers to the rare case in which a director's entanglement with the challenged decision is so personal and direct that he cannot weigh a demand to undo or rectify it—not the ordinary case of a director who made a decision and then defends it.

That focus explains why, when faced with a shareholder demand to direct the corporation to sue its directors, a director who was interested in the underlying transaction is viewed differently under a futility analysis than an uninterested director, even though both are asked to authorize a lawsuit against themselves. A director with an interest in the underlying transaction does not enjoy the presumption of having complied with section 2-

21

405.1's standard of conduct at the time the challenged decision is made, and thus it cannot be presumed that he would comply with that standard later, if faced with a shareholder demand to bring suit.

But a director who has no stake in the decision in dispute is presumed to have complied with subsection 2-405.1(c)'s standard of conduct when the initial decision was made, and that presumption will apply to subsequent decisions related to the initial one. Some business decisions made by corporate boards are revisited, reconsidered, and reevaluated when circumstances warrant. Among other things, boards may revisit a prior decision to change course or learn from prior mistakes. Thus, directors are presumed not only to exercise sound judgment when they make business decisions, but to bring that same judgment to bear when, for whatever reason, such decisions are subsequently reviewed or scrutinized. *Werbowsky,* 362 Md. at 619 (explaining that the demand gives directors "an opportunity to consider, or reconsider, the issue in dispute"). As the Seventh Circuit, whose reasoning we largely adopted in *Werbowsky*, put it: "[p]articipants who are not 'wrongdoers' may evaluate their acts and change their minds." *Kamen*, 939 F.2d at 461. Thus, a disinterested director gets the benefit of the presumption that he will investigate a shareholder demand in compliance with subsection 2-405.1(c)'s standard of conduct just as he would if called upon to revisit a past decision for some other reason. And if the director fails to comply with that standard when faced with a demand, the board's refusal would be subject to judicial review. Were it otherwise, demand would be futile in every

derivative case in which a director is a named defendant, an approach we rejected in *Werbowsky*.[4] 362 Md. at 618.

C

Two procedural aspects of the futility exception warrant emphasis.

*First*, a shareholder who files a derivative action without making a pre-suit demand must plead the facts that excuse the demand with particularity. *Werbowsky* requires that these facts "clearly demonstrate, in a very particular manner[]" that a demand would be futile, 362 Md. at 620, and the Maryland Rules now say the same: a derivative complaint must state "with particularity" either the efforts the plaintiff made "to obtain the desired action from the business entity" or "the reasons for not making an attempt to obtain the desired action[,]" Md. Rule 15-1601(b)(3).

*Second*, although futility is often raised and decided on a motion to dismiss, as it was here, it need not be. *Werbowsky*, 362 Md. at 620. The exception is fact-specific, and the issue "may be resolved as a factual matter." *Id.* at 621 (citation modified). A complaint that alleges enough to survive dismissal does not thereby conclusively establish futility; the question may be revisited on a fuller record. *Id.* at 620-21. Where the material facts bearing on futility are not genuinely disputed, a court may resolve the issue on summary judgment; where they are disputed, the issue "is a perfect candidate for resolution pursuant to Maryland Rule 2-502[,]" under which the court "may isolate the futility issue, take

---

[4] This does not mean a director can never be disabled by something that happens after the transaction. The presumption can be overcome—but only by particularized facts showing a genuine, disabling entanglement, not by the bare litigation exposure common to every defendant in a derivative lawsuit.

23

evidence on it, and make ultimate findings of fact with respect to it."[5] *Id.* at 621 (footnote omitted). We note this because it underscores a point central to the exception: futility is a question for the court, not the jury, and the court resolves it without trying the merits. *See id.* at 621-22.

## IV

We turn now to the amended complaint to determine whether the Shareholders' allegations satisfy the futility exception test.

The board has five members, so the Shareholders had to plead particularized facts showing that at least three of them could not consider a demand under the standard set forth in subsection 2-405.1(c). They did so as to Mr. Birzer, who was Tortoise's chief executive officer. The question before us is whether the amended complaint pleads facts that establish that at least two of the remaining four directors are unable to evaluate a pre-suit litigation demand under section 2-405.1's standard of conduct. We hold that it does not.

---

[5] Rule 2-502 provides that:

> If at any stage of an action a question arises that is within the sole province of the court to decide, whether or not the action is triable by a jury, and if it would be convenient to have the question decided before proceeding further, the court, on motion or on its own initiative, may order that the question be presented for decision in the manner the court deems expedient. In resolving the question, the court may accept facts stipulated by the parties, may find facts after receiving evidence, and may draw inferences from these facts. The proceedings and decisions of the court shall be on the record, and the decisions shall be reviewable upon appeal after entry of an appealable order or judgment.

## A

At the outset, we note that the Shareholders' liability theory—that the directors face substantial unexculpated liability—does not apply to the derivative claim against Tortoise. Count II, the only count before us, pleaded claims against both the directors and Tortoise. Only the claim against the directors, though, threatens to impose liability on the directors.

The Shareholders' principal theory is that demand is excused because the directors face unexculpated personal liability exceeding $1 billion—more than their insurance and their combined assets—for the losses they allegedly caused. Their demand-futility allegations begin by reciting the *Werbowsky* standard, alleging that a majority of the directors are so personally and directly conflicted or committed that they cannot consider a demand within the ambit of the business judgment rule. But that conclusion must be pleaded with factual particularity; stating the conclusion does not suffice. *See Werbowsky*, 362 Md. at 620.

In any event, that the remaining four directors allegedly face significant unexculpated liability does not establish futility. As explained above, a director who was disinterested relative to the initial decision will continue to enjoy the presumption of compliance with subsection 2-405.1(c)'s standard of conduct, and that does not change just because potential liability is unexculpated. To decide whether directors face a substantial or ruinous likelihood of unexculpated liability, a court would have to decide whether the directors were grossly negligent and whether the board has any defenses. That cannot be done without delving into the merits of the underlying claim. But *Werbowsky* directs courts to focus on the "real, limited, issue" of demand futility and avoid "injecting into a

25

preliminary proceeding issues that go more to the merits of the complaint—whether there was, in fact, self-dealing, corporate waste, or a lack of business judgment with respect to the decision or transaction under attack." *Id.* Thus, the potential for unexculpated liability does not establish futility.

B

The Shareholders contend that the board's conduct after the Funds' collapse shows that a demand would have been pointless—that the directors had, in the words of their amended complaint, "made clear beyond any conceivable doubt that they will oppose the assertion of any claims on behalf of the Funds[.]" That allegation speaks to how the board would answer a demand—that the answer would be no. But as we have explained, demand is not futile because it would likely be refused; it is futile only when the board cannot consider it under subsection 2-405.1(c)'s standard of conduct. *See id.* at 616-17; *Kamen*, 939 F.2d at 461-62.

We take up each aspect of the post-collapse conduct, as alleged by the Shareholders, in turn.

The Shareholders contend that the board failed "to take action to investigate, much less pursue," claims to recover the Funds' losses after the collapse, and that this inaction shows that pre-suit demand would have been pointless. But a board's failure to sue itself, on its own initiative, does not excuse failure to make pre-suit demand—if it did, the requirement would seldom apply, because a derivative action by its nature asserts a claim the corporation has not asserted for itself.

The Shareholders also rely on a books-and-records inspection demand they served as part of their investigation, contending that the demand—together with the third-party offer discussed below—put the board on notice and obligated it to investigate the potential claims. A request for books and records may signal that shareholders are looking into possible wrongdoing, but it is not the same as a request that the corporation file a lawsuit. It is the litigation demand, not an inspection request, that the law requires before filing a derivative suit. That the board did not respond to the inspection demand as the Shareholders wished tells us nothing about whether the board could have considered a litigation demand consistent with the statutory duty of care.

C

The Shareholders contend that by renewing Tortoise's advisory contracts after the collapse and publicly touting Tortoise's leverage management as "responsible" and the Funds' performance as "reasonable," the directors wedded themselves to the decision in dispute, as suing would be repudiating their own words.

Demand is not excused because directors approved the challenged decision, and it is not excused because they defended in public the relationship they approved. We would expect directors to speak well of their own stewardship, particularly to the investing public. A demand asks the directors to reconsider in private what they may feel bound to defend in public, and the fact that they defended it does not demonstrate that they cannot reconsider it. At most, these allegations show that the directors would be "hostile to the action"—a ground for futility *Werbowsky* rejected. 362 Md. at 618.

D

The Shareholders also rely on the October 2020 by-laws, which they allege were "illegal" under the Investment Company Act, 15 U.S.C. §§ 80a-1 to 80a-64, and were adopted for the "single purpose" of entrenching the directors and Tortoise against shareholder accountability.

But "illegal" is a legal conclusion, and adoption for the "single purpose" of entrenchment is a conclusory assertion of motive; neither is a well-pleaded fact we must accept under *Werbowsky*'s particularity requirement. Two facts concerning the by-laws were well-pleaded: that the board adopted the by-laws after the Funds' collapse and that they restricted shareholder voting and nomination rights. Even crediting that these actions were defensive, the Shareholders never connected them to the board's capacity to consider a demand. The amended complaint pleads no proxy contest, no pending nomination, no concrete threat to any director's seat, and no particularized facts showing that the by-laws were adopted to fend off litigation over the Funds' losses. A director may wish to keep his seat and still bring his honest judgment to a pre-suit demand; generalized allegations that directors are self-protective do not show otherwise. *Werbowsky*, 362 Md. at 619-20.

E

The Shareholders point to the board's treatment of an "offer" from a third party to acquire or prosecute the Funds' claims against Tortoise, which they call a "risk-free opportunity to monetize the claims" that no faithful fiduciary would have let pass.

The board's refusal to pursue such a transaction did not excuse the Shareholders' failure to demand that the board cause the Funds to sue Tortoise, let alone the directors.

28

*First*, the "offer" as pleaded, was merely a proposal to discuss acquiring the Funds' claims against Tortoise, not a request that the board cause the Funds to pursue specified litigation. Thus, the proposal to discuss an assignment of the Funds' claims triggered none of the duties that attach to a pre-suit demand. *Second*, the objection to the board's response goes to its wisdom, not its capacity: The board's counsel gave reasons for declining—fiduciary concerns, cost, confidentiality, the proposal's lack of specificity, and questions of legal permissibility. Had the Shareholders made a litigation demand and been refused, a court could review the refusal as explained above. They made no demand, and the board's handling of the proposal does not excuse that failure.

F

The Shareholders allege that Tortoise had a conflict of interest—its fees rose with the Funds' leveraged assets, so "more leverage means more fees"—and that Mr. Birzer, as Tortoise's chief executive, was an interested director.

Those allegations establish a disabling conflict for Mr. Birzer, which we have already credited. But Tortoise's fee conflict is Tortoise's; it is not automatically imputed to the four directors alleged to be independent. The amended complaint does not allege that they received Tortoise's fees, were employed or controlled by Tortoise, or had a relationship with Tortoise resembling Mr. Birzer's. That the independent directors should have watched Tortoise's management more closely may matter to the Shareholders' claim on the merits, but it does not show that they were disabled from considering a demand.

29

G

The Shareholders' last argument is that the allegations must be weighed together rather than one at a time, and on that, we agree. Futility is assessed on the whole of the particularized facts, not by considering each fact in isolation. Taken together, the Shareholders' allegations do not meet that standard. They describe directors who presided over heavy losses, renewed the adviser's contracts, praised the adviser, adopted defensive by-laws, opposed an earlier suit, declined a third party's overture to discuss an assignment of claims, and sat on a board that included the adviser's chief executive. That is a narrative of a board resistant to the Shareholders' claims, but resistance does not prove incapacity. What the Shareholders have, in the end, is a strong disagreement with how the directors managed the Funds and a confident prediction that the directors would have refused a demand. *Werbowsky* requires more: particularized facts showing that a majority of the board could not have considered the demand within the standard set forth in subsection 2-405.1(c). The Shareholders do not meet this standard; as such, their argument fails.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**

30